# Exhibit 47, Part 5 of 5

Agenterne havde ikke alene til opgave at videreformidle materiale, men også at forestå selv den direkte kommunikation med SKAT, ligesom agenterne forestod fremsendelse af dokumentationen for refusionsanmodningerne.

Agenterne anviste i deres anmodninger til SKAT på vegne af de 306 pensionsplaner og selskaber de udenlandske bankkonti, som man ønskede refusionsbeløbene overført til. Alle de af agenterne anviste bankkonti var konti tilhørende agenterne, og SKAT udbetalte på baggrund af en gennemgang af anmodningerne alle beløb angående anmodningerne til de af agenterne anviste bankkonti.

**1.3   Amerikanske pensionsplaner**

Langt de fleste af de 277 amerikanske pensionsplaner har ifølge det for SKAT oplyste været "401 (k) plans". Betegnelsen henviser til, at pensionsplanerne har været oprettet i henhold til betingelserne i Section 401 (a) i US Internal Revenue Code ("IRC").

En 401(k) plan etableres af en arbejdsgiver til fordel for dennes medarbejdere. Det er en forudsætning for oprettelse af en pensionsplan, at arbejdsgiveren har et Employer Identification Number (ENI), som tildeles af de amerikanske skattemyndigheder, IRS. Videre er det en betingelse for oprettelse af 401 (k) planer, at der er et formelt vedtaget *plan document*, og at der er en separat aftale med en trustee. Det pågældende *plan document* skal regulere vilkårene for pensionsplanen, herunder overholdelse af IRC og – hvis den finder anvendelse– the Employee Retirement Income Security Act ("ERISA"), samt anden gældende lovgivning. Aftalen med trustee'en skal regulere, hvordan pensionsplanens midler skal investeres og bestyres.

Indbetalinger til 401 (k) planer kan foretages af både arbejdstagere og arbejdsgiveren i henhold til pensionsplanens *plan document* og de grænser, der sættes af IRC. Når der bortses fra undtagelser om periodisering af bidrag ved årsskifter, kan indbetalingerne til en 401 (k) plan for hver deltager (både arbejdsgiver og arbejdstagere) ikke overstige det laveste af 1) en beløbsgrænse, der periodisk justeres for inflation ($53.000 i 2016 eller $59.000 for deltagere, der er 55 år eller ældre) og 2) 100 % af deltagerens kompensation fra arbejdsgiveren det pågældende år. Beløbsgrænsen er lavere for visse typer 401 (k) planer.

Generelt kan 401 (k) planer alene foretage udbetalinger som udlodning til deltagerne eller som dækning af tilladte udgifter for pensionsplanen. Udlodning til deltagerne kan kun ske under visse omstændigheder, f.eks. ved ophør af ansættelsesforhold, økonomisk hardship, død, invalidering, alder (59½ år) eller ophør af pensionsplanen uden succession. Sådanne udlodninger skal indberettes til IRS på Form 1099-R. Det bemærkes, at der kan være behov for andre formularer, hvis udlodningen sker til en person, der ikke er bosiddende i USA.

Bidrag til 401 (k) planer skal opbevares i en særskilt fond, der bestyres af en eller flere trustees, der – med visse undtagelser – har ekskl. ret til at bestyre pensionsformuen, herunder til at foretage investering af midlerne.

I nærværende sagskompleks har de omfattede trustees fungeret som bestyrere af pensionsplanerne på et overordnet niveau. Trustee'en har underskrevet fuldmagter på vegne af pensionsplanen *og* på vegne af den arbejdsgiver, der har oprettet planen. Der er omkring 70 forskellige trustees involveret i sagskomplekset. Langt de fleste er bosiddende i USA. Ud af de i alt 70 trustees repræsenterer 4 trustees samlet set 156 af de 277 amerikanske pensionsplaner.

Langt de fleste af de i sagen involverede 401 (k) planer er af typen "One-participant plans", hvilket også fremgår af SKATs afgørelser om tilbagekaldelse, hvor dette er tilfældet. "One-participant plans" er pensionsplaner for virksomhedsejere, der ikke har ansatte i den tilknyttede erhvervsvirksomhed (bortset fra eventuelt ejerens ægtefælle). Disse pensionsplaner består således, som ordlyden indikerer, udelukkende af ejeren (og eventuelt dennes ægtefælle). Pensionsplanen er i øvrigt undergivet samme regler og krav som øvrige 401 (k) plans, dog ikke ERISA.

"One-participant plans" er ikke forpligtede til at indsende regnskabsoplysninger (Form 5500) til de amerikanske myndigheder, når de har aktiver for højst $250.000 ved udgangen af pensionsplanens indkomstår (*plan year*).

Hvis "One-participant plans" har aktiver for over $250.000, har de pligt til at indsende regnskabsoplysninger (Form 5500) til de amerikanske myndigheder. Denne forpligtelse opfyldes normalt ved indsendelse af Form 5500-EZ, men kan i visse tilfælde i stedet opfyldes ved brug af Form 5500-SF.

Ud af de 277 pensionsplaner i sagskomplekset har langt den overvejende del heraf ikke indsendt Form 5500. Det må lægges til grund, at de øvrige pensionsplaner ikke har haft aktiver for mere end $250.000 ved udgangen af deres regnskabsår (*plan year*).

401 (k) planer indebærer en række skatteretlige fordele i USA. Således har arbejdsgiveren fradragsret for indbetalinger til pensionsplanen, arbejdstageren er skattefritaget for indbetalinger til pensionsplanen, og pensionsplanens midler/indkomst er fritaget fra indkomstbeskatning. Derudover er 401(k)-planerne i dobbeltbeskatningsoverenskomster med USA tillagt nogle skattefordele, herunder ret til refusion af udbytteskat fra udenlandske aktier. Når der i andre lande anmodes om disse fordele, skal pensionsplanen bevise, at den er hjemmehørende i USA.

### 1.4	Brokere

Almindeligvis er en broker en mægler, dvs. en mellemmand mellem investorer, der vil købe og sælge værdipapirer. Brokeren betales typisk et gebyr for sin rolle.

Brokeren sørger for matching af køber og sælger og dermed indgåelse af købsaftalen (executing broker) og/eller for gennemførsel af handlen (clearing broker), dvs. udveksling af parternes ydelser.

## 2.	Refusionsansøgninger
### 2.1	Perioden 2012-2015

Fra 2012 til 2015 har pensionsplanerne med henvisning til dobbeltbeskatningsoverenskomster mellem Danmark og det land, hvori de enkelte pensionsplaner var hjemmehørende, anmodet SKAT om refusion af indeholdt udbytteskat.

Refusionsanmodningerne blev indgivet af en række internationale agentvirksomheder via blanketordningen. Agenterne handlede på pensionsplanernes vegne.

Anmodningerne var vedlagt følgende:

1. Blanket 6.003 ENG – Claim to Relief from Danish Dividend Tax (afsnit 2.1.1, nedenfor),
2. Attest udarbejdet af en custodian i form af eksempelvis en "Credit Advice" for ejerskabet til de pågældende aktier og modtagelse af udbytte af aktierne (afsnit 2.1.2, nedenfor).
3. Form 6166 fra IRS (for så vidt angår de 277 amerikanske pensionsplaner) (afsnit 2.1.3, nedenfor) og
4. Fuldmagt fra pensionsplanen (afsnit 2.1.4, nedenfor),

På baggrund af pensionsplanernes anmodninger udbetalte SKAT de ansøgte beløb til agenternes oplyste konti, såfremt de rette dokumenter var vedlagt. SKAT foretog ikke nogen egentlig sagsbehandling i forbindelse med udbetalingerne.

I de sager, hvor Skattestyrelsen (tidligere SKAT) i 2018 har truffet afgørelse om at tilbagekalde de tidligere afgørelser om at refundere indeholdt udbytteskat, er det Skattestyrelsens opfattelse, at de indsendte dokumenter er uden realitet, og at refusionen er blevet ubetalt med urette.

### 2.1.1 Blanketten
Af anmodningsblanketterne fremgår bl.a., hvilket beløb agenten – på pensionsplanens vegne – søger refunderet, og at beløbet skal udbetales til agentens bankkonto. Endvidere erklærer agenten, at pensionsplanen er "beneficial owner" af de pågældende aktier.

Anmodninger indsendt i de konkrete førersager omtales nedenfor i afsnit 6.

### 2.1.2 Credit Advice
Som eneste "dokumentation" for pensionsplanernes krav på refusion af indeholdt udbytteskat var anmodningerne vedlagt Credit Advices (Tax Vouchers) udstedt af forskellige custodian (formueforvaltere). Disse Credit Advices er udstedt og indsendt som "dokumentation" for, at pensionsplanerne har ejet aktier i danske C20-selskaber, at pensionsplanerne har modtaget udbytter fra disse selskaber, og at der er indeholdt udbytteskat i de modtagne udbytter.

Alle Credit Advices udstedt af Solo-gruppen (dvs. Solo Capital, Old Park Lane, West Point og Telesto) er forsynet med et ID-nummer.

Disse Credit Advices viser – tilsyneladende – hvilke danske aktier pensionsplanerne var ejere af, hvilke udbytter der var blevet udloddet til pensionsplanerne, og hvilke udbytteskatter der var blevet indeholdt i forbindelse med udlodningerne.

I de sager, hvor Skattestyrelsen (tidligere SKAT) i 2018 har truffet afgørelse om at tilbagekalde de tidligere afgørelser om at refundere indeholdt udbytteskat, er det imidlertid Skattestyrelsens opfattelse, at de indsendte Credit Advices er uden realitet.

### 2.1.3 Form 6166
Form 6166 (Certificatation of US Tax Residency) er et certifikat, som udstedes af United States Treasury Department som dokumentation for, at et individ eller en virksomhed i amerikansk, skattemæssig henseende har hjemsted i USA. Certifikatet udstedes af Treasury Department på baggrund af pensionsplanens indsendelse af Form 8802 (Application for United States Residency Certification).

Oplysningerne i Form 8802 afgives under ansvar og efterprøves ikke af Treasury Department ved udstedelsen af Form 6166. Alle de i sagen omhandlede 277 amerikanske 401 (k) pensionsplaner har i deres anmodninger vedlagt Form 6166.

Form 6166-certifikatet bekræfter, at en juridisk person har domicil i USA i henhold til amerikansk skatteret. Det bemærkes, at certifikatet ikke dokumenterer, hvorvidt de øvrige betingelser for at modtage refusion af indeholdt udbytteskat fra udenlandske aktier er opfyldt i henhold til en dobbeltbeskatningsoverenskomst, herunder om ansøgeren reelt er ejer af de aktier, der ansøges om tilbagebetaling på baggrund af.

For at opfylde kravene til at modtage certifikatet skal pensionsplanen indsende en kopi af den underskrevne Form 5500 eller et IRS determination letter eller en erklæring (afgivet under strafansvar) om, hvorfor pensionsplanen ikke er forpligtet til at indgive Form 5500, og hvorfor pensionsplanen ikke har et IRS determination letter.

### 2.1.4 Power of Attorney
Den indsendte Power of Attorney giver agenten fuldmagt til på pensionsplanens vegne bl.a. at ansøge om refusion af indeholdt udbytteskat og modtage refunderede beløb fra SKAT.

### 2.2 Ny ansøgningsproces fra 2017 og fremefter
I starten af 2017 idriftsatte SKAT en ny IT-løsning for indberetning af anmodninger om refusion af udbytteskat. IT-løsningen fungerer som "TastSelv", hvor refusionsanmodningen uploades med tilhørende dokumentation.

Af SKATs hjemmeside fremgår, at det bl.a. er en betingelse for at få udbytterefusion, at der er indeholdt dansk udbytteskat af det udbytte, der søges om refusion for ("betingelse 3"), og at aktionæren er den retmæssige ejer af aktierne på tidspunktet for vedtagelsen af udbyttet ("betingelse 4"), jf. bilag E.

Som dokumentation for opfyldelse af betingelse 3 og 4 kan ifølge SKATs hjemmeside f.eks. fremlægges udbyttenota eller meddelelse fra depotbanken om modtaget udbytte, kontoudtog, depotoversigt med bl.a. oversigt over aktiebeholdningen på tidspunktet for vedtagelsen af udbyttet og købsbilag, jf. bilag E.

### 3. Aftaletyper
### 3.1 Global Master Securities Lending Agreement (GMSLA)

En GMSLA er en standard for låneaftaler udarbejdet af ISLA (The International Securities Lending Association). Standardaftalen giver mulighed for at indgå aftaler om udlån af værdipapirer, f.eks. aktier, på tværs af landegrænser.

GMSLA rummer en række standardvilkår, og derudover er der forskellige oplysninger, som parterne skal udfylde konkret.

GMSLA'en er dermed en *rammeaftale*. Det betyder, at GMSLA'en sætter rammerne i form af vilkår for aktieudlånet. GMSLA'en har imidlertid ikke betydning, medmindre parterne *faktisk* indgår aktielånsaftaler, som i så fald vil være omfattet af GMSLA'ens vilkår.

### 3.2 Forwards

En forward er en terminskontrakt. Det kan være en bindende aftale om fremtidig levering af en valuta eller vare til en på forhånd aftalt dato og pris. Forwardaftalen udgør dermed en kurssikring frem mod det tidspunkt, hvor den fremtidige levering skal finde sted, idet aftaleparterne på forhånd ved, hvilken pris varen/valutaen vil blive handlet for.

Forwardaftalen *behøver* ikke være bundet op på fysisk levering af aktivet, men kan også afregnes ved *differenceafregning*. Det vil sige, at parterne ved forward-kontraktens udløb – i stedet for at levere valuta/aktiver (f.eks. en aktiepost) – afregner differencen mellem markedsprisen og den i forwarden aftalte pris.

Ved differenceafregning er det ikke nødvendigt for parterne faktisk at besidde det aktiv, som forward-kontrakten er bundet til, da aktivet ikke skal leveres, men alene anvendes til at fastslå en betalingsforpligtelse.

<u>Eksempel</u>
A og B indgår en forward den 1. august 2019. Aftalen lyder på, at A den 1. september 2019 vil erhverve B's Novo Nordisk-aktier, der pr. 1. august har en kursværdi på 1 mio. kr., til 1,01 mio. kr.

Den 1. september 2019 skal aftalen afregnes. Aktiepostens markedsværdi forudsættes for eksemplets skyld at være steget til 1,2 mio. kr.

Afregningen kan herefter *enten* ske ved, at A køber aktieposten fra B for 1,01 mio. kr. *Eller* også kan afregningen ske ved differenceafregning:
Parterne havde aftalt at handle aktieposten til 1,01 mio. kr., men aktieposten har en værdi på 1,2 mio. kr. (markedsprisen, også kaldet spotprisen). Aktieposten er dermed 190.000 kr. mere værd end parternes aftalte pris. B skal i så fald betale A 190.000 kr., hvilket udgør forskellen på den aftalte pris og markedsprisen på udløbsdatoen.

### 4. Civile retsskridt

Skattestyrelsen har foretaget en række civilretlige skridt i sagen i flere forskellige jurisdiktioner, herunder i USA, Tyskland og England. Dette sker med henblik på at inddrive statens økonomiske tab på over 12,7 milliarder kroner, der uberettiget er blevet udbetalt til de af agenterne anviste konti. Skattestyrelsen har således rejst såvel tilbagesøgnings- og erstatningskrav over for en række forskellige aktører i sagen for at få fastslået deres respektive betalingsforpligtigelser.

Herunder er alle pensionsplaner, der er repræsenteret af Lundgrens, blevet sagsøgt med krav om betaling.

Der er endnu ikke truffet nogen endelige realitetsafgørelser i sagskomplekset.

Der er dog en række tilfælde, hvor udenlandske domstole har taget stilling til (dele af) sagskomplekset, og hvor afgørelserne ikke er underlagt tavshedspligt:

#### 4.1.1   *Tyskland: Arrest for ca. 2,2 milliarder kroner*

I juni 2018 blev der gennemført civilretlige beslaglæggelser og arrester i forskellige jurisdiktioner, herunder i Tyskland. I forbindelse med arresterne har SKAT beskrevet og ført bevis for den formodede svindel i sagskomplekset.

For at få medhold i en arrestbegæring i Tyskland skal tre betingelser være opfyldt:

1. der skal være et retligt grundlag for kravet mod ejerne,
2. det skal være overvejende sandsynligt, at de pågældende aktiver reelt tilhører midler udbetalt af SKAT, og
3. der skal være risiko for, at aktiverne flyttes eller taber deres værdi til skade for SKAT, såfremt arrest ikke gennemføres.

Skattestyrelsen har gennemført arrest i Tyskland for ca. 2,2 milliarder kr.

#### 4.1.2   *USA: Retssager for ca. 5,4 milliarder kr. anlagt – og ikke afvist*

I USA har SKAT antaget et amerikansk advokatfirma til at rådgive om muligheden for at forfølge SKATs tilbagesøgnings- og erstatningskrav i USA mod de involverede amerikanske pensionsplaner. Der er ved en række amerikanske domstole, primært i New York, i perioden frem mod den 15. juni 2018 anlagt i alt 155 retssager mod pensionsplaner, ledelsesmedlemmer og trustees for disse pensionsplaner og i enkelte tilfælde tredjeparter med tilknytning til pensionsplanerne og ansøgningerne. Samlet set er der anlagt retssager for ca. 5,4 milliarder kr.

Herunder er alle amerikanske pensionsplaner repræsenteret af Lundgrens blevet stævnet.

Første retsmøde i en række af de anlagte retssager blev gennemført den 26. juni 2018 i New York.

Pensionsplanerne fremsatte over for retten i Southern District of New York en begæring om afvisning af sagerne. Pensionsplanerne henviste herved bl.a. til, at retten ikke har jurisdiktion, idet Skattestyrelsens krav – ifølge pensionsplanerne – er omfattet af common law-doktrinen "the revenue rule", som indebærer, at amerikanske domstole ikke har jurisdiktion over sager, der direkte eller indirekte søger håndhævelse af fremmede landes skattelovgivning. Reglen indebærer med andre ord, at fremmede landes skattemyndigheder ikke kan indbringe krav, som direkte eller indirekte kan karakteriseres som skattekrav, for de amerikanske domstole.

Retten afviste den 9. januar 2019 pensionsplanernes begæring om afvisning i deres helhed (**bilag AF**). Det fremgår bl.a. af rettens kendelse (s. 4), at

> *"If plaintiff can prove that the defendants never in fact owned the relevant Danish stocks – and the Court is obliged to accept their allegations as true for present purposes – the revenue rule would not apply because the substance of the claims would be for garden variety commercial fraud. Accordingly, the motion to dismiss is denied."*

Retten lægger herved bl.a. vægt på, at Skattestyrelsen i sin stævning har gjort gældende, at der er tale om svindel ("*commercial fraud*") (kendelsen s. 11 ff.), samt at stillingtagen til sagen ikke kræver en fortolkning af begrebet "*beneficial ownership*" i dansk skattelovgivning. Skattestyrelsen har således – uden at sondre mellem faktisk og retmæssigt ejerskab – påstået, at pensionsplanerne ikke har ejet aktierne, og pensionsplaner har ikke fremlagt dokumentation for det modsatte (kendelsen s. 16).

### *4.1.3   Forlig: Tilbagebetaling af hhv. 10 mio. kr. og 1,6 mia. kr.*
Skattestyrelsen har i sagskomplekset indgået to forlig med i alt 63 amerikanske pensionsplaner og dertil knyttede personer og selskaber:

I efteråret 2018 indgik Skattestyrelsen forlig med 2 amerikanske pensionsplaner. De to pensionsplaner havde tidligere indgivet klager til Skatteankestyrelsen. Da sagerne blev forligt i efteråret 2018, blev klagerne tilbagekaldt. Forligene indebar, at de to pensionsplaner tilbagebetalte de refunderede beløb, jf. Skatteministeriets pressemeddelelse af 1. november 2018 (**bilag AG**) og pressemeddelelse af 29. maj 2019 (**bilag AH**).

I maj 2019 indgik Skattestyrelsen en ny forligsaftale. Den nye forligsaftale blev indgået med 61 amerikanske pensionsplaner og en række dertil knyttede personer og selskaber. De 61 pensionsplaner havde i perioden 2012-2015 fået udbetalt cirka 2,9 milliarder kroner. Heraf havde pensionsplanerne selv fået udbetalt cirka 1,6 milliarder kroner. Forliget lød på, at pensionsplanerne og de dertil knyttede personer og selskaber skulle tilbagebetale cirka 1,6 milliarder kroner. Restbeløbet forfølger Skattestyrelsen fortsat hos andre ansvarlige parter (bilag AH).

Det kan således konstateres, at 63 amerikanske pensionsplaner ind til videre har indgået forlig i sagskomplekset, og at forligene omfatter mere end en femtedel af den samlede, formodede svindel.

### 5.   SKATs dataanalyse
SKAT har gennemgået de indgivne refusionsanmodninger og sammenholdt disse med de danske C20-selskabers udlodninger, aktiekapital, mv. På den baggrund har SKAT foretaget en samlet analyse af, om refusionsanmodningerne samlet set *kan* være korrekte.

Analysen resulterede i to delkonklusioner, der gennemgås nærmere i det følgende:

> Der er refunderet for meget i forhold til, hvad der er indeholdt
> I nogle tilfælde er der refunderet *større beløb,* end der er indeholdt af udbytteskat. Det dokumenterer, at (en del af) refusionsanmodningerne er svindel, idet refusionen ikke kan overstige det indeholdte beløb.

> Refusionsanmodningerne bygger på usandsynligt store investeringer i og ejerandele af danske selskaber
> Det er *helt usandsynligt*, at meget betydelige andele af danske C20-virksomheder skulle være ejet af ukendte pensionsplaner mv., der ofte alene har én ejer, og som højst har et meget beskedent kapitalgrundlag.

Analysens delkonklusioner viser, at der er svindlet i betydeligt omfang.

#### 5.1.1  *Grundlaget for SKATs analyse*

SKAT har analyseret en række udlodninger fra udvalgte danske selskaber, hvor pensionsplanerne mv. efterfølgende har ansøgt om refusion af påstået indeholdt udbytteskat. SKATs analyse har været koncentreret om de udlodninger, hvor der er tilgået størst provenu til pensionsplanerne mv., og hvor SØIK har indhentet materiale fra VP Securities. Analysen har dermed omfattet cirka 12,4 mia. kr. ud af den samlede svindel på 12,7 mia. kr.

##### 5.1.1.1  *Det retlige grundlag*

Når selskaber udlodder udbytte, har de som udgangspunkt pligt til at indeholde 27 % udbytteskat ved alt udbytte. Indeholdelse kan dog ske med f.eks. 0 % eller 15 % i stedet afhængigt af omstændighederne og oplysninger om udbyttemodtageren, jf. kildeskattelovens §§ 65-67 A.

Indeholdelse med andre satser end 27 % er udtryk for, at skatteyderen er omfattet af en undtagelsesbestemmelse, jf. f.eks. kildeskattelovens § 65, stk. 11, og kildeskattebekendtgørelsens § 31, stk. 1, nr. 2. I sådanne tilfælde vil der ikke (retmæssigt) kunne anmodes om refusion af udbytteskat i henhold til dobbeltbeskatningsoverenskomster, idet udbyttemodtageren ikke opfylder undtagelsesbestemmelsernes krav, hvis denne er skatteretlig udlænding. Det er altså kun, når der er indeholdt 27 % udbytteskat, at der kan anmodes om refusion.

Herudover skal anmodningerne støttes på en dobbeltbeskatningsoverenskomst. Det er derfor et krav, at den, der fremsætter anmodningen, ikke er hjemmehørende i Danmark, idet personen i et sådant tilfælde ikke vil være omfattet af en dobbeltbeskatningsoverenskomst.

Der kan således alene (retmæssigt) søges om refusion af udbytteskat, hvis indeholdelse er sket med satsen 27 % over for en (skattemæssig) udlænding.

##### 5.1.1.2  *De faktiske oplysninger*

For danske børsnoterede selskaber sørger VP Securities for at registrere, hvilken beskatning der skal ske over for hver af de registrerede ejere, når der udloddes udbytte. Videre forestår VP Securities selve udlodningen. Herefter oplyser VP Securities selskabet om udlodningerne, bl.a. sådan at selskabet kan opfylde sin oplysningsforpligtelse over for SKAT.

Selskaber har nemlig pligt til at oplyse til SKAT, hvad der er udloddet i alt, og hvad der er indeholdt i udbytteskat med hver af de givne procentsatser (blandt andet 15 % og 27 %). På denne baggrund har SKAT kendskab til:

> Udloddet beløb.
> Indeholdt udbytteskat – både samlet og fordelt på de respektive procentsatser.

SKAT har desuden oplysninger om alle refusionsanmodningerne, idet disse har været stilet til SKAT. Oplysningerne har været registreret i IT-systemet 3S for så vidt angår ansøgninger fra blanketordningen.

Da SKAT fik kendskab til, at der kunne være svindlet med refusionsanmodninger vedrørende udbytteskat, lavede SKAT manuelt en opgørelse af, hvad der samlet er anmodet om refusion af for hver udlodning. Herudover opgjorde SKAT manuelt, hvor meget netop pensionsplanerne mv. har anmodet om refusion af pr. udlodning. Samlet har SKAT dermed på nuværende tidspunkt kendskab til:

> Samlede refusionsanmodninger for hver udlodning.
> Refusionsanmodningerne fra pensionsplanerne mv. for hver udlodning.

Herudover har SKAT modtaget en række supplerende oplysninger fra VP Securities, som SØIK har indhentet. Det er oplysninger, der er udtrukket direkte fra VP Securities' registre vedrørende en række specifikke udlodninger. Heraf fremgår bl.a. det samlede antal aktier (i hver aktieklasse) i

omløb på udlodningstidspunktet og navn og adresse på hver enkelt registreret ejer på udlodningstidspunktet.

Oplysningerne om ejerskab registreret i VP Securities er ikke fuldstændige. En betydelig del af aktierne i børsnoterede selskaber er registreret som ejet af f.eks. banker, der har ét fælles depot for deres kunder (kaldet et omnibusdepot). Her står banken registreret som ejer hos VP Securities, selvom det er en kunde, der faktisk ejer aktiebeholdningen. Omnibusdepoter er registreret med depotindehaverens (typisk bankens) nationalitet/adresse – uden viden om den underliggende ejers nationalitet. Hertil kommer, at det *kan* være, at adresser registreret i VP Securities ikke er blevet opdateret ved aktieejerens flytning.

SKAT har anvendt adresseoplysningerne fra VP Securities til at fastlægge, om ejeren (skatteretligt) er udlænding. Henset til, at en meget betydelig andel af danske C20-aktier opbevares i omnibusdepoter, *kan* andelen af udenlandske aktionærer være anderledes end det, der fremgår af VP Securities' registreringer. Opgørelsen giver dog alligevel en indikation af, hvor stor en andel af aktierne, der har været ejet af personer, som er hjemmehørende i andre lande end Danmark.

På baggrund af selskabernes indberetninger og de indhentede data fra VP Securities har SKAT opnået kendskab til:

> Samlet antal aktier i omløb på udbyttedatoen.
> Andel af aktierne, der er registreret som ejet af udlændinge på udbyttedatoen.

Endelig har SKAT indsamlet en række offentligt tilgængelige informationer om blandt andet aktiekurser og udbytte pr. aktie.

### 5.1.2   *Resultatet af analysen*
#### 5.1.2.1   *Der er refunderet for meget i forhold til, hvad der er indeholdt*

SKAT har overordnet sammenholdt refusionsanmodningerne med den indeholdte udbytteskat for de udlodninger i perioden 2012-2015 fra danske C20-selskaber, hvor der har været mest omfattende svindel med refusionsanmodninger (bilag C1). Det er dermed ikke samtlige udlodninger, der har været omfattet af analysen, men derimod en række udvalgte udlodninger.

Analysen har vist, at 76,9 % af det indeholdte beløb på tværs af de analyserede udlodninger er blevet udbetalt som udbytterefusion.

Hvis der kigges på de enkelte udlodninger hver for sig, fremgår det, at der i 11 tilfælde er *refunderet mere, end der er indeholdt* (bilag C1), og at svindlen har udgjort en meget stor del af refusionsanmodningerne. I tre tilfælde har *pensionsplanerne mv. alene* fået refunderet mere end det indeholdte beløb.

Når der er refunderet mere, end der er indeholdt, siger det sig selv, at nogle af refusionsanmodningerne har været uberettigede. Der kan ikke være krav på at få "refunderet" noget, der aldrig har været indeholdt.

SKAT har herefter foretaget en endnu mere dybdegående analyse (bilag C2). Som gennemgået er der alene mulighed for at få udbytterefusion, hvis der er indeholdt udbytteskat med satsen 27 %, *og* udbyttemodtageren er (skatteretlig) udlænding.

Analysen viser, at 91,7 % af det udbytte, der er indeholdt med satsen 27 %, er blevet refunderet. Når der tages højde for, *at* det ikke er alle aktier med en udbytteskattesats på 27 %, der er ejet af udlændinge, *at* det er langt fra alle udlændinge, der overhovedet er berettigede til refusion, og *at* mange

udlændinge maksimalt vil være berettigede til delvis refusion, er det tydeligt, at (en del af) refusionsanmodningerne har været uretmæssige.

Dette ses særligt for de enkelte udlodninger hver for sig. Der er i 14 tilfælde _refunderet mere end den udbytteskat_, der efter VP Securities' registreringer er indeholdt med _satsen 27 %_ (bilag C2). Det _kan ikke_ lade sig gøre (retmæssigt).

Videre er der i 23 tilfælde _refunderet mere end den udbytteskat_, der efter VP Securities' registreringer er indeholdt _fra udlændinge med satsen 27 %_ (bilag C2).

*5.1.2.2   Refusionsanmodningerne er udtryk for usandsynlige investeringer og ejerandele*
SKAT har videre sammenholdt refusionsanmodningernes oplysninger om antal aktier på udbyttetidspunktet med de officielle aktiekurser den pågældende dato (bilag C3). På den måde har det været muligt at beregne den samlede investering for pensionsplanerne mv. i hvert enkelt C20-selskab på udbyttetidspunktet.

Som det fremgår, har den samlede investering for pensionsplanerne mv. været på cirka 910 mia. kr. i løbet af marts 2015.

Henset til de forskellige datoer for udlodning i de forskellige selskaber har investeringerne dog ikke nødvendigvis været samtidige, selvom de er inden for samme måned. Som eksempel har investeringerne netop den 19. marts 2015 udgjort kr. 445 mia. i Novo Nordisk (B) og kr. 13,2 mia. i GN Store Nord, i alt kr. 458,2 mia.

Endelig har SKAT sammenholdt refusionsanmodningernes oplysninger om antal aktier med selskabernes samlede aktiekapital (bilag C4). Herudfra er det beregnet, hvor stor en andel af selskabernes samlede aktiekapital, som pensionsplanerne mv. samlet skulle have ejet. Dette er blevet sammenholdt med, hvor stor en andel af selskabets aktier der har været tilgængelige for sådanne investeringer.

Som det fremgår, skulle pensionsplanerne mv. blandt andet have ejet 51,4 % af A.P. Møller-aktierne i 2014, 59,5 % af Novo Nordisk B-aktierne i 2014 og 66,9 % af FL Smidth & Co.-aktierne i 2015.

Overordnet set er det _helt usandsynligt_, at aktionærer/aktører, der er ukendte på det danske marked, skulle have foretaget _så store_ investeringer og besidde så betydelige andele af aktiekapitalen. Tallene understøtter dermed, at en stor andel af refusionsanmodningerne nødvendigvis må være uretmæssige.

Særligt i forhold til A.P. Møller-aktierne bemærkes det, at fire kendte, danske storaktionærer tilsammen ejede 52,82 % af aktiekapitalen i 2014 (bilag D), og det var dermed _umuligt_, at pensionsplanerne mv. skulle eje 51,4 %.

### 6.    Aktiekøb: Vilkår for settlement er ikke markedskonforme

Nedenstående oversigt viser, hvorledes pensionsplaner repræsenteret af Lundgrens – i sagskompleksets 1. bølge af klagesager – der anvender ED&F Man som custodian, har settlet deres aktiehandler (sammenfattende indlæg, afsnit 4.5):

|  | American | | Kamco LP Profit | | Kamco Investments | | DW Construction | | Linden | | Moira | | Riverside | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Køb | Salg | Køb | Salg | Køb | Salg | Køb | Salg | Køb | Salg | Køb | Salg | Køb | Salg |
| Coloplast | 5/12-13 (T+4) | – |  |  |  |  |  |  |  |  |  |  |  |  |
| Novozymes |  |  |  |  |  |  |  |  |  |  | 25/2-14 (T+3) | 22/5-14 (T+3) |  |  |
| TDC | 5/3-14 (T+3) 6/3-14 (T+4) 6/3-14 (T+4) | – | 5/3-14 (T+3) 6/3-14 (T+4) 6/3-14 (T+4) | 10/6-14 (T+3) | 6/3-14 (T+4) | 10/6-14 (T+3) | 6/3-14 (T+4) | 10/6-14 (T+3) | 6/3-14 (T+4) | 10/6-14 (T+3) | 6/3-14 (T+4) | 10/6-14 (T+3) | 6/3-14 (T+4) | – |
| Danske Bank | 18/3-14 (T+4) 17/3-14 (T+3) 18/3-14 (T+4) | 10/6-14 (T+3) | 18/3-14 (T+4) 18/3-14 (T+4) 18/3-14 (T+4) | 10/6-14 (T+3) | 18/3-14 (T+4) | 10/6-14 (T+3) | 18/3-14 (T+4) | 10/6-14 (T+3) | 18/3-14 (T+4) | 10/6-14 (T+3) | 18/3-14 (T+4) | 10/6-14 (T+3) | 18/3-14 (T+4) | – |
| Novo Nordisk | 20/3-14 (T+4) | 10/6-14 (T+3) | 20/3-14 (T+4) 19/3-14 (T+3) | 10/6-14 (T+3) | 20/3-14 (T+4) | 10/6-14 (T+3) | 20/3-14 (T+4) | 10/6-14 (T+3) | 20/3-14 (T+4) | 0 | 20/3-14 (T+4) | – | 20/3-14 (T+4) | – |
| Mærsk-B | 28/3-14 (T+3) | 10/6-14 (T+3) | 31/3-14 (T+4) | 10/6-14 (T+3) |  |  | 31/3-14 (T+4) | 10/6-14 (T+3) |  |  | 31/3-14 (T+4) | 10/6-14 (T+3) |  |  |
| Tryg | 2/4-14 (T+3) | 10/6-14 (T+3) |  |  |  |  |  |  | 3/4-14 (T+4) | – | 3/4-14 (T+4) | 10/6-14 (T+3) | 3/4-14 (T+4) | – |
| D/S Norden |  |  |  |  |  |  |  |  | 23/4-14 (T+4) | 10/6-14 (T+3) |  |  | 23/4-14 (T+4) | – |
| Coloplast |  |  |  |  | 8/5-14 (T+4) 8/5-14 (T+4) | 10/6-14 (T+3) | 8/5-14 (T+4) 8/5-14 (T+4) | 10/6-14 (T+3) | 8/5-14 (T+4) | 10/6-14 (T+3) |  |  | 8/5-14 (T+4) | – |
| TDC | 7/8-14 (T+2) | – | 7/8-14 (T+2) | 22/9-16 (T+3) | 7/8-14 (T+2) | 22/9-16 (T+3) | 7/8-14 (T+2) | 22/9-16 (T+1) |  |  | 7/8-14 (T+2) | 22/9-16 (T+1) |  |  |
| Chr. Hansen Holding | 27/11-14 (T+2) | – |  |  |  |  |  |  |  |  |  |  |  |  |
| Coloplast | 3/12-14 (T+2) | 10/12-14 (T+2) |  |  |  |  | 3/12-14 (T+2) | – |  |  | 3/12-14 (T+2) | 8/12-14 (T+1) |  |  |
| Novozymes | 25/2-15 (T+3) | 26/2-15 (T+2) |  |  |  |  |  |  | 23/2-15 (T+2) | – |  |  |  |  |
| TDC |  |  |  |  |  |  |  |  | 4/3-15 (T+2) | 6/3-15 (T+2) |  |  | 4/3-15 (T+2) | – |
| DSV |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Pandora |  |  |  |  |  |  |  |  |  |  |  |  | 17/3-15 (T+2) | – |
| Danske Bank |  |  |  |  |  |  |  |  |  |  |  |  | 13/3-15 (T+1) | – |
| Novo Nordisk |  |  |  |  |  |  |  |  |  |  |  |  | 13/3-15 (T+2) | – |

**Pensionsplanens sammenfattende indlæg af 15. november 2019**
Pensionsplanen har udtalt sig således:

"Med henvisning til Skatteankestyrelsens indstilling af 4. oktober og Skattestyrelsens kommentarer af 18. oktober skal klager hermed vende tilbage.

Det bemærkes at den nedlagte påstand fastholdes.

Baggrunden for indstillingen er i det væsentligste at Skatteankestyrelsen ikke finder at den dokumentation, klager har modtaget fra ED&F kan tillægges bevismæssig vægt ved sagens afgørelse.

Det skal hertil bemærkes, at ED&F har ageret som custodian på vegne af klager, og at ED&F har haft til opgave at foretage de handler, klager har haft mulighed for at foretage. Det har stedse været klagers opfattelse at ED&F har fulgt de instrukser der er modtaget fra klager og at disse instrukser har medført de køb og salg af aktier, som klager har givet instrukser til ED&F om at gennemføre.

Klager er i sagens natur ikke i stand til at udtale sig med sikkerhed om hvad der er sket internt i ED&F i forbindelse med gennemførelsen af transaktionerne. Klager mangler således en grundlæggende forståelse af og indsigt i de interne forhold hos ED&F til at kunne udtale sig om hvorvidt de omhandlede transaktioner, som klager har instrueret ED&F i at udføre, faktisk også er blevet foretaget.

Klager har imidlertid intet objektivt grundlag for at konkludere at ED&F ikke har ageret loyalt og korrekt og i overensstemmelse med gældende lovgivning.

Derfor må klager nødvendigvis lægge de dokumenter til grund, som klager har modtaget fra ED&F.

Det er fortsat klagers opfattelse at disse dokumenter netop dokumenterer de for sagen relevante forhold, nemlig;

- At klager har haft finansiering til køb af de omhandlede aktier
- At klager gennem ED&F har købt de omhandlede aktier eftersom klager fra ED&F har modtaget bekræftelse på at have købt aktierne
- At klager har betalt købesummen for de omhandlede aktier
- At de pågældende aktier er blevet registreret på klagers depot hos ED&F
- At klager har modtaget udbytte fra det udbyttebetalende selskab
- At klager har fået indeholdt kildeskat på udbytteudlodningen
- At klager efterfølgende har solgt de omhandlede aktier
- At klager har modtaget salgssummen for de omhandlede aktier

Klager har fremlagt sædvanlig og behørig dokumentation for ovenstående forhold, hvilken dokumentation da også har foranlediget SKAT til at træffe afgørelse om at SKAT ville tilbagebetale den indeholdte kildeskat, som SKAT havde modtaget fra det udbytteuddloddende selskab i relation til de udbytteudlodninger, klager modtog.

\*\*\*\*\*\*\*\*\*\*

Skatteankestyrelsens indstilling har som det bærende element en forudsætning om at der ikke kan fæstnes lid til den dokumentation, klager har modtaget fra ED&F.

Som ovenfor anført har klager intet grundlag for at antage at den dokumentation, man har modtaget fra ED&F ikke skulle være retvisende og et korrekt udtryk for de faktiske omstændigheder.

Klager har noteret sig indholdet af Skattestyrelsens indlæg af 18. oktober. Af dette indlæg fremgår at ED&F i en retssag anlagt i England tilsyneladende skulle have anerkendt at have udstedt tax vouchers

med et ikke korrekt indhold. Dette skulle gøre sig gældende i 89 tilfælde og skulle vedrøre samlede refusioner på i alt ca. 184 mio. kr.

Klager har fået refunderet 21.060.000 kr. i indeholdt kildeskat og af disse beløb skulle 8.613.000 kr. være tilbagebetalt uretmæssigt som følge af de påståede fejlagtige Tax Vouchers.

Klager er ikke bekendt med baggrunden for at disse Tax Vouchers skulle være forkerte. ED&F har anført at klager i det angivne omfang ikke har fået udbetalt dividende og derfor ikke har fået indeholdt kildeskat.

Dette synes imidlertid at være i modstrid med den dokumentation, klager har modtaget fra ED&F.

Klager er ikke bekendt med baggrunden for den påståede fejl og Skattestyrelsen har ikke fremlagt nogen yderligere dokumentation for at de påståede forhold skulle være korrekte, ligesom Skattestyrelsen ikke har forklaret hvorfor man anser disse Tax Vouchers for fejlagtige.

Tilbage står således at klager ikke har mulighed for at få indsigt i hvad der er sket hos ED&F og hvad de påståede fejl kan skyldes. Klager må på denne baggrund nødvendigvis henholde sig til den dokumentation, klager har modtaget løbende fra ED&F (klager er ikke part i det søgsmål, der er anlagt i London og hvorfra de omhandlede informationer stammer) og klager må fastholde at samtlige de modtagne Tax Vouchers (og sagens øvrige dokumenter) naturligvis er korrekte.

Det bemærkes blot for god ordens skyld at selv hvis ED&F måtte have udstedt fejlagtige Tax Vouchers til klager for et beløb på 8.613.000 kr., så kan det derfor også sluttes at de Tax Vouchers, der relaterer sig til det resterende beløb, som SKAT har udbetalt til klager (12.447.000 kr.) omvendt må have et korrekt indhold som kan tjene som grundlag for klagers berettigede modtagelse af refusion af indeholdt kildeskat.

Det kan således også konkluderes at tilbagesøgning for i alt kr. 12.447.000 ifølge denne argumentation nødvendigvis må være korrekt.

\*\*\*\*\*\*\*\*\*\*

Skattestyrelsen har i sit indlæg af 12. august 2019 beskrevet en handel med Chr. Hansen-aktier, som efter Skattestyrelsens indhold ikke kan tillægges vægt.

Dette bestrides.

Skattestyrelsens opfattelse bygger på en forkert forståelse af hvorledes aktierne efter klagers opfattelse er blevet handlet. Skattestyrelsens konklusion er ligeledes fejlagtig.

Den handel med Chr. Hansen-aktier, som Skattestyrelsen har beskrevet i sit indlæg af 12. august er gentaget i sin helhed i Skattestyrelsens Indlæg af 18. oktober. Det står ikke klart hvad baggrunden for en fuld gentagelse af samme omstændigheder er.

Med henvisning til de samme bilag, som klager selv har fremlagt og som Skattestyrelsen har fremlagt i sit indlæg af 12. august skal klager hermed gennemgå handelen, som denne korrekt er foregået iht. de fremlagte bilag. Gennemgangen vil vise at Skattestyrelsens konklusion er fejlagtig og at klager har købt de pågældende aktier, modtaget dividende på disse og fået indeholdt kildeskat på samme udlodning.

Helt overordnet er det Skattestyrelsens konklusion at klagers tilbagesøgning på Chr. Hansen-aktierne ikke har været retmæssig eftersom der skulle være tale om "lånte" aktier.

Det er imidlertid ikke korrekt. Klager har ikke lånt de pågældende aktier og Skattestyrelsens konklusion bygger således på en forkert forståelse af de faktiske forhold eller en forkert forståelse eller gengivelse af den fremlagte dokumentation.

Det er i den forbindelse uden betydning hvorledes ED&F har anskaffet de pågældende aktier - afgørende er alene hvorvidt klager har foretaget et reelt køb af disse.

Klager har været civilretlig ejer af de pågældende aktier på datoen for vedtagelse af udbytteudlodningen, hvilket kan læses uf det fremlagte bilagsmateriale, hvilket bliver gennemgået i det følgende.

Det skal dog kraftigt betones at klager ikke har haft kendskab til hvorledes handlerne de facto er blevet gennemført og at klager således ikke har haft viden om eller kendskab til hvorledes ED&F har ageret, når klager har ønsket at købe en given aktiepost. De følgende betragtninger er således baseret på klagers forståelse af det bilagsmateriale, Skattestyrelsen har fremskaffet og fremlagt i sagen.

Baseret på det nu fremlagte bilagsmateriale - som klager ikke har haft kendskab til eller viden om på tidspunktet for gennemførelsen af transaktionerne - er det klagers opfattelse at hændelsesforløbet har været som følger:

Det synes korrekt at ED&F har lånt 800.000 kr. aktier af Morgan Stanley, jf. bilag Å2.

Som de fremlagte bilag fremstår for klager må ED&F have bogført disse på en custody account tilhørende ED&F.

ED&F har herefter valgt at købe de lånte aktier, hvorefter aktierne internt i ED&F er blevet flyttet til en anden custody account. Det civilretlige ejerskab til aktieposten er herefter overgået til ED&F, og ED&F har herefter været den retmæssige ejer fra et skattemæssigt synspunkt - og dette med den virkning at långiver ikke længere har været ejer (hverken civilretligt eller skattemæssigt).

ED&F har herefter solgt den samme aktiepost til klager med tillæg af et processing fee på 0,00125%. Dette er ganske i overensstemmelse med Skattestyrelsens beskrivelse af faktum, jf. Skattestyrelsens indlæg af 12. august p. 12 nederst og p. 13 øverst

Herefter har klager været den civilretlige ejer af den omhandlede aktiepost og klager har været den skattemæssigt retmæssige ejer af den omhandlede aktiepost.

Som det tydeligt fremgår er der ikke tale om "lånte aktier". Der er tale om at klager har købt de omhandlede aktier fra ED&F. Ejerskabet til aktierne er således overgået til klager.

Der er således ikke tale om "lånte aktier".

Klager har købt og civilretligt erhvervet de omhandlede aktier, hvilket da også fremgår af Skattestyrelsen egen dokumentation i sagen.

Finansieringen af handelen kan ses af bilag Å1 p. 2 under "pending trades". Det er således ikke korrekt når Skattestyrelsen påstår at klager ikke har haft økonomisk mulighed for at finansiere den pågældende handel."

**Skattestyrelsens supplerende sammenfattende indlæg af 31. marts 2020**

"

**Skatteankestyrelsens j.nr. 18-0006637 – Førersager, klagere repræsenteret af Lundgrens Advokatpartnerselskab – Supplement til Skattestyrelsens sammenfattende indlæg**

Skattestyrelsen afgav sammenfattende indlæg i fire sager den 18. oktober 2019, hvori der planlægges retsmøde den 15. maj 2020. Dette supplement til sammenfattende indlæg angår de tre førersager, hvor ED&F Man har været anvendt som custodian:

| SANSTs j.nr. | Navn |
|---|---|
| 18-0005426 | American Investment Group Of New York, L.P. Pension Plan |
| 18-0005414 | Kamco LP Profit Sharing Pension Plan |
| 18-0005308 | Del Mar Asset Management Saving & Retirement Plan |

Indlægget er supplement til det sammenfattende indlæg i hver af sagerne, afsnit 5.2 og skal læses i sammenhæng med det afsnit.

Skattestyrelsen har siden afgivelse af sammenfattende indlæg foretaget yderligere undersøgelser af forholdene angående ED&F Man. Undersøgelserne giver anledning til følgende supplerende bemærkninger i forhold til systematikken hos ED&F Man, der viser, at pensionsplanernes "aktiebesiddelser" kun har været en skrivebordsøvelse:

1. **SUPPLERENDE BEMÆRKNINGER OM ED&F MANS SKRIVEBORDSØVELSE: TDC-AKTIER**

Skattestyrelsen gennemgik i sit sammenfattende indlæg, afsnit 5.2, hvordan ED&F Man konstruerede køb og SWIFT-meddelelser for Kamco LP Profit Sharing Pension Plan (SANST j.nr. 18-0005414) ("Kamco") angående TDC-aktier i august 2014 ved at handle aktier frem og tilbage mellem to af ED&F Mans egne konti.

Desuden dokumenterede Skattestyrelsen, hvordan der blev konstrueret "dokumentation" for, at Kamco "solgte" aktierne i efteråret 2016 efter over to års "ejerskab" (en helt usædvanlig lang periode for dette sagskompleks), mens ED&F Man i størstedelen af "ejerperioden" ikke havde haft én eneste TDC-aktie.

Skattestyrelsen har ved <u>yderligere</u> gennemgang konstateret, at "salget" i september 2016 (bilag AA1 (Revideret), s. 5) tilsyneladende var motiveret af en henvendelse fra SKAT (**bilag AA10**). SKAT sendte en materialeforespørgsel til ED&F Man den 4. august 2016 (bilag AA10.1). Materialet blev efterspurgt til brug for en kontrol af en TDC-aktiepost i august 2015 for DW Construction Inc Retirement Plan ("DW Construction"), hvor SKAT senere traf afgørelse om afslag på refusionsanmodningen. DW Construction påklagede ikke afslaget, men har en verserende klagesag om tilbagekaldelse af refusionsafgørelser (SANST j.nr. 18-0005398).

ED&F Man sendte materiale til svar den 16. august 2016 (bilag AA10.2), hvilket gav anledning til en ny forespørgsel fra SKAT den 9. september 2016 (bilag AA10.3). Henvendelsen blev ikke besvaret, men den 22.-23. september 2016 "solgte" Kamco og fire andre pensionsplaner – herunder DW Construction – sine TDC-aktier fra august 2014 (bilag AA1 (Revideret), s. 5, smh. med **bilag AA9.1-9.5**).

Den 11. oktober 2016 sendte SKAT samme brev, men til en ny adresse (bilag AA10.4). Det brev besvarede ED&F Man den 11. november 2016 (bilag AA10.5).

Den tætte tidsmæssige sammenhæng mellem SKATs henvendelse angående TDC-aktier for 2015 og ED&F Mans konstruktion af salgsdokumenter for TDC-aktierne fra 2014 er påfaldende.

For så vidt angår konstruktionen af salgsdokumenter for TDC-aktierne fra 2014, jf. også det sammenfattende indlæg, afsnit 5.2.2, viser Skattestyrelsens undersøgelser desuden, at det ikke kun var Kamco, men også fire yderligere pensionsplaner repræsenteret af Lundgrens Advokatpartnerselskab, herunder som nævnt DW Construction, som ED&F Man konstruerede salgsdokumentation for i september 2016 (bilag AA1 (Revideret), s. 5, smh. med bilag AA9.1-9.5). Det drejede sig om følgende fem pensionsplaner, der alle har påklaget afgørelserne om tilbagekaldelse af refusionsafgørelserne, bl.a. for disse TDC-aktier fra 2014:

| SANSTs | Navn |
|---|---|
| 18-0005398 | DW Construction Inc. Retirement Plan |
| 18-0005426 | American Investment Group Of New York, L.P. Pension Plan (førersag) |
| 18-0005423 | Kamco Investments, Inc, Pension Plan |
| 18-0005414 | Kamco LP Profit Sharing Pension Plan (førersag) |
| 18-0005427 | Moira Associates LLC 401 (K) Plan |

Salgsdokumentationen blev konstrueret ved, at ED&F Man den 22. september 2016 lånte 3,5 mio. TDC-aktier fra ING Bank (bilag AA1, s. 5, næstsidste postering). Derefter handlede ED&F Man henholdsvis 3,5 mio., 3 x 3,4 mio. og 2.901.000 aktier frem og tilbage mellem to interne konti (de røde markeringer i bilag AA1 (Revideret), s. 5 og s. 12-13). De fem interne handler skete ifølge kontoudtogene med få minutters mellemrum (bilag AA7 (revideret), smh. med **bilag AA8**). Skattestyrelsen har i bilag AA1 (Revideret), s. 5, markeret, hvilke pensionsplaner de respektive transaktioner angår.

Herefter har de fem pensionsplaner hver en salgsnota for sin aktiepost, der matcher med et af de fem interne salg (bilag AA9.1-9.5).

Dette medfører, at hvis én af pensionsplanerne kontrolleres alene, ligner det, at ED&F Man havde det nødvendige antal aktier på sin konto (op til 3,5 mio. TDC-aktier), og der er dokumentation for handlen (pengeoverførsel og flytning af aktier mellem konti). Det er kun, når alle fem kontrolleres samlet, at det fremgår, at der er tale om konstrueret dokumentation, hvor 3,5 mio. lånte aktier blev til "salg" af 15,6 mio. aktier.

Det understreges, at ED&F Man ikke har anerkendt nogen fejl angående TDC-aktier i august 2014.

Samlet underbygger disse yderligere undersøgelser, hvordan dokumentationen fra ED&F Man helt generelt er uden bevisværdi, idet den fremstilles til lejligheden og ikke er udtryk for reelle transaktioner."

**Retsmøde**
Pensionsplanens repræsentant har fastholdt påstand og anbringender.

Repræsentanten har bl.a. anført, at SKAT har begrundet afgørelsen om tilbagekaldelse af tidligere afgørelse om refusion af udbytteskatter med meget generelle betragtninger, hvilket efter almindelige forvaltningsretlige principper ikke opfylder krav til en begrundelse.

Repræsentanten har tillige anført, at den sag, der skal bedømmes, alene er sagen om tilbagekaldelse af udbytterefusion, idet der ikke er hjemmel til at vurdere den oprindelige sag, hvor udbytterefusion blev udbetalt.

Repræsentanten har om SKATs afgørelse i øvrigt anført, at bevisbyrden for at tilbagekalde den oprindelige afgørelse påhviler SKAT, hvilken bevisbyrde SKAT ikke har løftet.

Repræsentanten har om de af ED&F Man erkendte fejl begået i en række aktiehandler anført, at det må lægges til grund, at de øvrige aktiehandler foretaget af ED&F Man er korrekte aktiehandler.

Skattestyrelsen repræsenteret ved Kammeradvokaten har heroverfor bl.a. anført, at en vurdering af SKATs afgørelse om tilbagekaldelse af udbytterefusion kræver stillingtagen til den oprindelige sag om udbetaling af udbytterefusion, idet det kun herved kan vurderes, om den oprindelige sag er truffet på et forkert grundlag. Der er henvist til UfR 2020.1923 H, hvoraf fremgår, at en forkert afgørelse skal tilbagekaldes.

Skattestyrelsen har om de af ED&F Man begåede fejl udtalt, at der er tale om betydelige fejl, der ikke af ED&F Man er nærmere redegjort for. Der kan ikke ud fra de erkendte fejl drages en slutning om, at der for så vidt angår øvrige aktiehandler er tale om korrekte transaktioner.

**Landsskatterettens afgørelse**
Det fremgår bl.a. af kildeskattelovens § 69 b, stk. 1, at har nogen, der er skattepligtige efter § 2 eller selskabsskattelovens § 2, modtaget udbytte, royalty eller renter, hvori der efter §§ 65-65 d er indeholdt kildeskat, som overstiger den endelige skat efter en dobbeltbeskatningsoverenskomst, tilbagebetales beløbet inden 6 måneder fra told- og skatteforvaltningens modtagelse af anmodning om tilbagebetaling.

Af dobbeltbeskatningsoverenskomsten mellem USA og Danmark fremgår af artikel 10, stk. 3, litra c, at udbytte fra et selskab hjemmehørende i Danmark ikke beskattes i Danmark, såfremt den retmæssige ejer er en pensionskasse, som omtalt i artikel 22, stk. 2, litra e, der er hjemmehørende i USA. Det er en forudsætning, at sådant udbytte ikke hidrører fra udøvelse af virksomhed af pensionskassen eller gennem et forbundet foretagende.

Af dobbeltbeskatningsoverenskomstens artikel 22, stk. 2, litra e, fremgår, at en person, der er hjemmehørende i en kontraherende stat, alene skal være berettiget til alle fordele efter denne overenskomst, hvis denne person er en juridisk person, hvad enten fritaget for beskatning eller ikke, der er organiseret efter lovgivningen i en kontraherende stat med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændige erhvervsdrivende. Det er en forudsætning, at mere end 50 pct. af denne persons begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i en af de kontraherende stater.

Refusion af udbytteskat er betinget af, at Pensionsplanen har ejet aktier, og at Pensionsplanen har modtaget udbytte af disse aktier, hvor der i forbindelse med udbetalingen af udbyttet er indeholdt udbytteskat.

Landsskatteretten finder, at det påhviler Pensionsplanen at bevise, at disse betingelser er opfyldte, og at Pensionsplanen på den baggrund var berettiget til refusion af udbytteskat.

Det bemærkes herved, at der indenfor dansk civilret, herunder skatteretten, gælder et udgangspunkt om ligefrem bevisbyrde. Dette vil bl.a. sige, at den, der påstår at have et krav, skal godtgøre, at kravet består. Det følger således af de almindelige bevisbyrderegler, at den, der er nærmest til at tilvejebringe og sikre sig den relevante dokumentation, også bærer bevisbyrden.

Landsskatteretten finder ikke, at denne bevisbyrde er løftet.

Landsskatteretten finder, at Pensionsplanen ikke var berettiget til udbetaling af udbytterefusion. Der er herved lagt vægt på, at det ikke er dokumenteret, at Pensionsplanen har købt og været ejer af de omhandlede påståede aktier eller har modtaget udbytte af aktierne. Den dokumentation, der er fremlagt i form af e-mails til og fra ED&F Man, udskrifter fra ED&F Man benævnt Account Equity, Account Transactions og Account Statement vedrørende transaktioner ved køb og salg af aktier og indgåelse af optioner og swaps, dokumenterer ikke Pensionsplanens ejerskab til aktierne. Heller ikke de fremlagte SWIFT-meddelelser, der ifølge Pensionsplanen er dokumentation for, at aktiernes købesum er betalt, opfylder krav til dokumentationen for, at der handlet aktier på Pensionsplanens vegne, idet Skattestyrelsen har påvist, at ED&F Man ved at erhverve 800.000 stk. aktier i Chr. Hansen Holding A/S for 0 kr. alene har lånt aktierne. Det kan herefter ikke lægges til grund, at ED&F Man har "handlet" disse aktier på Pensionsplanens vegne. Der ses således ikke at være den fornødne forbindelse til Pensionsplanen, der dokumenterer, at aktietransaktionerne m.v. har passeret Pensionsplanens økonomi, og der er ikke fremlagt dokumentation for pengestrømme til og fra Pensionsplanen vedrørende aktiehandler fra custodian eller andre aktører involveret i aktietransaktionerne m.v., ligesom der ikke er fremlagt dokumentation for Pensionsplanens finansiering af aktiekøb. Det bemærkes, at der på trods af Skatteankestyrelsens anmodning om bl.a. aftaler mellem Pensionsplanen og dennes trustee samt aftaler med ED&F Man, om korrespondance mellem Pensionsplanen og ED&F Man og om aftale mellem Pensionsplanen og ED&F Man om køb/salg af aktier m.v. ikke er fremlagt materiale herom.

Der er endvidere henset til, at ED&F Man har erkendt at have udarbejdet fejlagtige Tax Vouchers for amerikanske pensionsplaner. ED&F Man har således erkendt, at 8.613.000 kr. ud af de udbetalte refusioner på i alt 21.060.000 kr. vedrører ukorrekte Tax Vouchers for så vidt angår Pensionsplanen. Landsskatteretten finder det derfor betænkeligt at lægge det modtagne materiale fra ED&F Man til grund som dokumentation for Pensionsplanens køb af de påståede aktier.

Landsskatteretten kan ikke tiltræde det af Pensionsplanen anførte om, at der alene skal tages stilling til den foreliggende sag om tilbagekaldelse af udbytterefusion uden en vurdering af den oprindelige sag om refusion om udbytteskat.

Betingelserne for at en afgørelse er ugyldig og dermed bør annulleres er, at den pågældende afgørelse lider af en retlig mangel, at denne er væsentlig, og at særlige omstændigheder ikke taler imod ugyldighed. Til retlige mangler hører bl.a. mangler, der angår den retlige subsumption, det vil sige spørgsmålet om, hvorvidt betingelserne for at udstede afgørelsen og kravene til dens indhold er opfyldt i det pågældende tilfælde. Årsagen hertil kan være, at myndigheden ved afgørelsens udstedelse har befundet sig i en vildfarelse om sagens faktiske omstændigheder. Sådanne retlige mangler anses i almindelighed som væsentlige i sig selv og vil typisk føre til, at afgørelsen anses for ugyldig. Retten skal i den forbindelse bl.a. henvise til FOB2005.527.

Landsskatteretten skal som klageinstans efterprøve, om betingelserne for SKATs tilbagekaldelse/annullation af de tidligere trufne afgørelser om refusion af udbytteskat har været opfyldt. I denne prøvelse indgår en nødvendig vurdering af, om der oprindeligt var grundlag for at yde refusion af udbytteskat. Det er Landsskatterettens vurdering, at Pensionsplanen hverken for SKAT eller Landsskatteretten har fremlagt det fornødne bagvedliggende materiale, som kan understøtte, at betingelserne for refusion af udbytteskat er opfyldt. Der henvises til Landsskatterettens afgørelser af 19. december 2019 (offentliggjort som SKM2019.650.LSR) og 13. januar 2020 (offentliggjort som SKM2020.29.LSR).

Da Pensionsplanen ikke er anset for at have ejet aktier eller modtaget udbytte som angivet i forbindelse med anmodningerne om udbytterefusion, finder Landsskatteretten, at SKAT har udbetalt refusionerne på et urigtigt grundlag på baggrund af Pensionsplanens ansøgninger. SKAT har derfor været berettiget til at annullere de oprindelige afgørelser om udbetaling af udbytterefusion, idet bemærkes, at SKATs anvendelse af ordet "tilbagekaldelse" ikke kan føre til et andet resultat.

Den påklagede afgørelse stadfæstes derfor.

Susanne Dahl
Ledende retsformand

Anette Duvald
Sagsbehandler

**Vejledende medholdsvurdering**

Skatteankestyrelsen skal komme med en udtalelse om, i hvilket omfang der er givet medhold i klagen.

Medholdsvurderingen har betydning for, i hvilken grad klageren kan få omkostningsgodtgørelse af udgifter til rådgivning under klagesagen. Medholdsvurderingen er kun vejledende. Ansøgning om omkostningsgodtgørelse skal sendes til Skattestyrelsen, som træffer afgørelsen.

Skatteankestyrelsen udtaler følgende:

Der er ikke givet medhold i det påklagede forhold.

**Afgørelsen sendes til**

American Investment Group Of New York, L.P. Pension Plan, 75 Claremont Rd Suite 309,

LUNDGRENS ADVOKATPARTNERSELSKAB, Tuborg Boulevard 12, 2900 Hellerup

Skattestyrelsen

Advokatfirmaet Poul Schmith, Kammeradvokaten I/S, Vester Farimagsgade 23, 1606 København V